# In the United States Court of Federal Claims

No. 09-523 C

(Filed October 13, 2009)[1]

| | | |
|---|---|---|
| * * * * * * * * * * * * * * | * | |
| KERR CONTRACTORS, INC., | * | |
| | * | Post-Award Bid Protest; Review |
| Plaintiff, | * | of Award of Jetty Capping |
| | * | Contract; Technical Evaluation |
| v. | * | of Proposals; Meaningful and |
| | * | Equal Discussions; *De Minimis* |
| THE UNITED STATES, | * | Deviation from Source Selection |
| | * | Plan; Prejudice to Protestor; |
| Defendant, | * | Supplementation of the |
| | * | Administrative Record. |
| KIEWIT PACIFIC CO., | * | |
| | * | |
| Intervenor-defendant. | * | |
| * * * * * * * * * * * * * * | * | |

*Joseph A. Yazbeck, Jr.*, Portland, OR, for plaintiff. *David H. Bowser*, Portland, OR, of counsel.

*Patryk J. Drescher*, United States Department of Justice, with whom were *Tony West*, Assistant Attorney General, *Jeanne E. Davidson*, Director, *Brian M. Simkin*, Assistant Director, Washington, DC, for defendant. *John Breiling*, Department of the Army, Portland District Corps of Engineers, Portland, OR, of counsel.

*Douglas L. Patin*, Washington, DC, for intervenor-defendant. *Daniel P. Golden*, Washington, DC, of counsel.

---

[1]/ This opinion was issued under seal on September 25, 2009. Pursuant to ¶ 5 of the ordering language, the parties were invited to identify source selection, proprietary or confidential material subject to deletion on the basis that the material was protected/privileged. The parties conferred and notified the court that no redactions of the sealed opinion are necessary. Thus, the sealed and public versions of this opinion are identical, except for the publication date, this footnote and one updated case citation.

———————————————————————

**OPINION**

———————————————————————

**Bush**, *Judge*.

Kerr Contractors, Inc. (Kerr) filed its post-award bid protest complaint on August 10, 2009, challenging an award of a contract under Solicitation No. W9127N-09-R-0024 to Kiewit Pacific Co. (Kiewit) by the United States Army Corps of Engineers (Corps). Compl. ¶ 1, Ex. 1 at 1. The contract is for the Tillamook North Jetty Capping Project in Tillamook, Oregon. This bid protest is now before the court on cross motions for judgment on the administrative record (AR). The administrative record was filed on August 24, 2009, and briefing followed according to an expedited schedule. Kerr offers the declaration of its president, Mr. Brent Kerr, as a supplement to the administrative record (Kerr Decl.). Oral argument was held on September 15, 2009. For the reasons set forth below, defendant's motion for judgment on the administrative record is granted.

## BACKGROUND

### I.   Solicitation

The solicitation for the jetty capping project was issued on May 15, 2009, with offers due on June 16, 2009. AR at 3. The project is valued at more than $10,000,000, and the solicitation indicates that the Corps was to conduct a negotiated procurement for a firm, fixed price contract. *Id.* at 3, 25. The jetty work required by the contract includes "the procurement of rock, establishment of a lay down storage area for the rock, revetment repair and placement of the procured stone." *Id.* at 19. The project has a completion date in the fall of 2010: "The Contractor shall be required to . . . complete the entire work ready for use not later than 30 September 2010." *Id.* at 48. There are, in addition to the completion date, other time constraints applicable to specific phases of construction. *Id.* at 49.

Bidders were informed that the "successful offeror will be selected solely on the basis of the evaluation factors set forth" in the solicitation. AR at 19. Each

proposal was to include price and technical components, in separate volumes. *Id.*
The solicitation specifies that each volume "shall be separate and complete in itself
so that evaluation of one may be accomplished independently from evaluation of
the other." *Id.* at 20. In addition, the technical proposal could not "contain
reference to price." *Id.*

### A.    Technical Evaluation Factors

The technical volume was to be evaluated for three factors: technical,
performance risks and management plan. AR at 19. As to the technical factor, the
solicitation states that "[t]he proposal will be rated on the offeror's proposed
project work plan to determine if it is consistent with the scope of work required by
this RFP, and on the suitability and condition of equipment for stone quarry,
delivery, and placement." *Id.* at 20. The Corps would also evaluate how
"effectively and completely" each proposal discussed quarry production, jetty
stone delivery, and jetty stone placement. *Id.* at 20-21.

As to the evaluation of the performance risks factor, the Corps would
determine the "probability of successful accomplishment of the work." AR at 22.
A good proposal would show "a reasonable degree of certainty that the offeror
would deliver quality work on time." *Id.* The three performance risks elements are
the offeror's proposed schedule, past performance, and safety. *Id.*

The final technical proposal evaluation factor is the offeror's management
plan. AR at 23. This factor evaluates the "realism and flexibility" of the technical
proposal of each offeror. *Id.* Resumes of various managers, engineers and
subcontractors were to be reviewed by the Corps. *Id.* The Corps would review
qualifications, experience and accomplishments, as markers that would
demonstrate that "the offeror's project team is well able to do this work." *Id.*

### B.    Price Evaluation Factors

The solicitation states that "only those proposals that are found to be
technically acceptable will be evaluated on price." AR at 23. For technically
acceptable proposals, the Corps was to then determine the "reasonableness and
affordability" of those proposals. *Id.* The Corps would conduct a price analysis,
by comparing the prices of technically acceptable proposals with the prices of other
proposals and the Corps' own estimate. *Id.* The solicitation states that

"[p]roposals found to have an unrealistic price may be deemed to be unacceptable and may not receive further consideration." *Id.* Price would also be a factor if the Corps decided to form a competitive range of proposals. *Id.*

## C.    Basis for Award

The court reproduces here the solicitation's description of the decision-making process leading to contract award:

> This contract will be awarded using a Lowest Price Technically Acceptable method. The Government will evaluate whether the offeror can demonstrate they are able to perform the work outlined within the contract. All contractors determined to be technically acceptable will then be evaluated on price in order to determine award.
> Note: The Government intends to make an award without discussions, but reserves the right to conduct discussions should discussions prove to be necessary or advantageous to the Government. Because the Government does not intend to hold discussions offerors are encouraged to include their best pricing in their initial proposal.

AR at 23. As this excerpt shows, the solicitation does not present a weighting scheme for the technical evaluation factors, nor is there a detailed scoring system for determining whether a proposal will be deemed technically "acceptable" or "unacceptable." Instead, as the Source Selection Plan (SSP) explains, the difference between unacceptable and acceptable proposals largely depends on whether a proposal is rated to include deficiencies.[2] *Id.* at 356. In an acceptable proposal, "[t]here may be some weaknesses; however, there are no deficiencies." *Id.* An unacceptable proposal, on the other hand, "contains deficiencies resulting in an increased risk of unsuccessful contract performance." *Id.*

---

[2]/ Another reason to reject a proposal as unacceptable is for poor past performance of other relevant contracts. AR at 356. Poor past performance is not an issue in this bid protest. *See id.* at 280.

Each evaluator was to screen the technical proposals and identify weaknesses, significant weaknesses and deficiencies. AR at 351, 355-56. A weakness is "[a] flaw in the proposal that increases the risk of unsuccessful contract performance." *Id.* at 356. A significant weakness is "[a] flaw that appreciably increases the risk of unsuccessful contract performance." *Id.* A deficiency is "[a] material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level."[3] *Id.*

Although the solicitation does not fully outline the mechanism for completing the technical evaluation of proposals, the SSP sets forth the Corps' evaluation procedures, including a plan for discussions with offerors, should these become necessary. The SSP describes the roles and responsibilities of the Source Selection Board (SSB) members and the SSB Chairperson. AR at 350-52. The SSB Chairperson, among other duties, was tasked with protecting the confidentiality of price information until the technical evaluation of proposals was completed. *See id.* at 350 (stating that the SSB Chairperson "[e]nsures the price proposals are not released to anyone conducting the evaluation of technical proposals until that evaluation is completed and the technical evaluation findings are documented"), 353 (same). The SSB Chairperson also "[p]articipates as an individual evaluator for each technical proposal performing the functions outlined . . . for the SSB members." *Id.* at 350. The SSB Chairperson for this procurement was Michelle M. Rhodes. *Id.* at 349.

The role of the SSB members was to evaluate proposals and help prepare the technical evaluation findings documentation. AR at 351. The SSB members, and the SSB Chairperson, would, if discussions were held with offerors, "re-evaluate[] each technical proposal submitted as a result of discussions, performing the same responsibilities outlined [in evaluating initial proposals]." *Id.* at 352. The SSB

---

[3] The level of detail in the ratings of proposals, at least as to the designation of specific weaknesses, significant weaknesses and deficiencies, is less evident in the Source Selection Board (SSB) evaluation report showing the consensus rating of proposals, than it is in the ratings produced by the individual SSB members. *Compare* AR Tab 5 *with id.* Tabs 12-15.

members assigned to this procurement were Richard A. Gunsolus, Heidi P. Moritz, Jeffrey S. Edwards, and Beth McNair.[4]  *Id.* at 350, 463.

## II.    Initial Proposal Evaluation Results

Four offerors submitted proposals:  Kiewit Pacific Co.; Kerr Contractors, Inc.; Steelhead Constructors, Inc.; and, Tapani Underground, Inc.  The SSB found Kiewit's technical proposal to be acceptable, and the other three proposals to be unacceptable.  AR at 264, 268-69, 272.  The SSB was particularly concerned by the proposed jetty stone placement plans in the three unacceptable proposals, and the equipment proposed to effectuate the jetty stone placement.  *See id.* at 265-67, 269-71, 272-74.  The type of proposed crane, and the proposed method of using that crane and other stone placement equipment, constituted one of the most decisive evaluation factors.  *See id.* at 275 (stating that "the other three proposals were found to have inadequate cranes to perform the work among other weaknesses and deficiencies").  The Corps decided to have discussions with all offerors, to "provide an opportunity for the contractors to revise their proposals."  *Id.*

## III.    Discussions, Revised Proposals and Contract Award

The Corps sent letters to all four offerors, informing them that "the Government has opened discussions with the offerors in the competitive range for [the] solicitation [for the] Tillamook North Jetty Capping Project."  AR at 318, 321, 325, 329.  Three offerors were informed of "deficiencies and/or weaknesses" in their technical proposals, whereas Kiewit was informed that its stone procurement pricing was higher than the government's estimate, and that its proposal was lacking certain documentation.  *Id.*  For the three proposals rated unacceptable, the offerors were alerted to problems with their jetty stone placement plans.  *Id.* at 321, 325, 329.  The Corps prepared pre-negotiation objectives and discussion points for the July 9, 2009 meetings, to be held separately with each offeror.  *Id.* at 333-41.

---

[4]/ Ms. McNair, although appointed to the SSB, does not appear to have participated in SSB functions.

Both Michelle Rhodes and Jeffrey Edwards, members of the SSB, were present during discussions with all offerors which took place on July 9, 2009. AR at 286. It is clear that Kiewit's price information was disclosed, to some extent, during these discussions, *id.* at 288; *see also id.* at 799-800, and that technical evaluation deliberations continued after July 9, 2009, *id.* at 584. After the discussions meetings were held on July 9, 2009, all four offerors submitted revisions to their proposals on July 16, 2009. Kerr was contacted after the meeting for further clarification as to its use of excavators for jetty stone placement. *Id.* at 275; *see also* Compl. ¶ 7.

According to the SSB, Kiewit submitted the only revised proposal that was acceptable. AR at 275-76, 283. The Corps sent Kiewit an award letter on July 31, 2009, *id.* at 262, and sent the other offerors debriefing letters on August 5, 2009, *id.* at 389-401.[5] The government estimate for the Tillamook North Jetty Capping Project was $13,760,427. *Id.* at 388. The proposals received, from most expensive to least expensive, are as follows: Kiewit, $16,133,285; Tapani, $13,202,500; Steelhead, $11,972,727; and, Kerr, $11,294,573. *Id.* Kerr filed its protest in this court on August 10, 2009.

## DISCUSSION

## I.      Jurisdiction

This court "shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2006). The jurisdictional grant is "without regard to whether suit is instituted before or after the contract is awarded." *Id.* Because Kerr objects to the award of the contract to Kiewit, this court has subject matter jurisdiction to entertain this bid protest.

## II.      Standards of Review

---

[5]/ According to plaintiff, Kerr also received a phone call on July 31, 2009, indicating that contract award would be to Kiewit. Compl. ¶ 8.

## A.     Judgment on the Administrative Record

Rule 52.1(c) of the Rules of the United States Court of Federal Claims (RCFC) provides for judgment on the administrative record.  To review a motion, or cross-motions, under RCFC 52.1(c), the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record.  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356-57 (Fed. Cir. 2005).  The court must make factual findings where necessary.  *Id.*  The resolution of RCFC 52.1 cross-motions is akin to an expedited trial on the paper record.  *Id.*

## B.     Bid Protest Review

As a threshold matter, the plaintiff in a bid protest must show that it has standing to bring the suit.  *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (*ITAC*).  Standing arises from prejudice, which is present if the plaintiff establishes that it had a substantial chance of receiving the contract, but for the alleged procurement error.  *Id.* (citing *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)).  A protestor possessing a "substantial chance" of winning the contract has a "direct economic interest" in the procurement, and has standing before this court.  *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307-08 (Fed. Cir. 2006) (citing *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369-70 (Fed. Cir. 2002)).

As the United States Court of Appeals for the Federal Circuit has stated, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A) [(2006), a standard used in the Administrative Procedure Act (APA)]: a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004) (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057-58 (Fed. Cir. 2000)).  Under this APA standard, a procurement decision may be set aside if it lacked a rational basis or if the agency's decision-making involved a violation of regulation or procedure.  *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (*Impresa*) (citations omitted).  *De minimis* errors in the procurement process, however, do not justify relief.  *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996) (citing *Andersen Consulting v. United States*, 959 F.2d 929, 932-33, 935 (Fed. Cir. 1992)).  The bid protest

plaintiff bears the burden of proving that a significant error marred the procurement in question. *Id.* (citing *CACI Field Servs., Inc. v. United States*, 854 F.2d 464, 466 (Fed. Cir. 1988)).

The court gives great deference to an agency's technical evaluation of an offeror's proposal. *Textron, Inc. v. United States*, 74 Fed. Cl. 277, 297 (2006). "[T]echnical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996) (citations omitted); *Omega World Travel, Inc. v. United States*, 54 Fed. Cl. 570, 578 (2002) ("It is well settled that contracting officers are given broad discretion with respect to evaluation of technical proposals." (citing *E.W. Bliss*, 77 F.3d at 449)). "[W]here an agency's decisions are highly technical in nature, . . . judicial restraint is appropriate and proper." *Electro-Methods, Inc. v. United States*, 7 Cl. Ct. 755, 762 (1985) (citing *Isometrics v. United States*, 5 Cl. Ct. 420, 423 (1984)).

"'If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.'" *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971)). If, on the other hand, "the trial court determines [that] the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract[,] . . . it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct." *Bannum*, 404 F.3d at 1351. Plaintiff again bears the burden of proof, and must "show that there was a 'substantial chance' [plaintiff] would have received the contract award but for the [government's] errors in the [procurement] process." *Id.* at 1358 (citations omitted). If a protestor can show that there was a substantial chance that it would have won the contract award but for the procurement error of the agency, prejudice has been established. *Id.* at 1353 (citations omitted). "Prejudice is a question of fact." *Id.* (citing *Advanced Data Concepts*, 216 F.3d at 1057).

## III.   Standing

Kerr's proposal had the lowest price of the proposals submitted in response to the solicitation. AR at 388. But for the errors alleged by plaintiff to have resulted in its proposal's unacceptable rating, Kerr would have had the lowest price

technically acceptable offer, and would have had a substantial chance of winning the contract.  Kerr therefore has standing to bring this protest.  *ITAC*, 316 F.3d at 1319 (citation omitted).

## IV.    The Award Decision and Plaintiff's Allegations of Error

### A.    The Unacceptable Rating

The court begins with a review of the unacceptable rating received by Kerr's proposal.  Although there are many aspects of the evaluation of Kerr's proposal that could be considered, the court's main concern must be whether the deficiencies noted by the Corps lacked a rational basis or were contrary to law.  As noted above, only when deficiencies are found may a proposal be rated unacceptable and removed from consideration.

The administrative record contains many fundamentally consistent articulations of the deficiencies found in Kerr's proposal.  For example, in the debriefing letter sent to Kerr, three deficiencies are mentioned in summary form: "Reach on excavators," "Lack of experience on the Jetty Head," and "Tide window and weather assessment."  AR at 390.  As to the excavators proposed for certain jetty stone placement work, the Corps informed Kerr that "[t]his equipment does not appear to be capable of performing the work as described in the proposal addendum [because] [i]t does not have the reach required to perform all the work." *Id.* at 392.  Regarding the lack of experience on a jetty head (or "bullnose"), the Corps stated that Kerr apparently failed "to understand the significant challenges of the bullnose jetty work," and that the "combination of lack of experience and understanding results in an unacceptable rating for the management plan." *Id.* Lastly, the Corps noted a deficiency in Kerr's proposal related to safety: "Concerns have been raised as to Kerr's dependence upon excavators and the plans

to work with tide elevations of +6 feet raise[] some significant safety concerns."[6]
*Id.*

The Source Selection Authority (SSA), describing the Corps' contract award
decision, adopted the findings of the SSB and agreed that Kerr's proposal was
unacceptable in the technical, performance risks and management plan factors, and
unacceptable overall.  AR at 275-77.  The SSA referred to the "detailed
explanation" in the Source Selection Technical Evaluation Report.  *Id.* at 276.  This
report did not provide a comprehensive list of weaknesses and significant
weaknesses, but rather focused upon determining whether proposal provisions
were technically acceptable or technically unacceptable, noting three instances
where Kerr's proposal was unacceptable, and finding Kerr's proposal to be
unacceptable overall.  *Id.* at 278-80.  The discussion in the report is consistent with
Kerr's debriefing letter.  Problems with the reach of the excavators, unsuitable
exposure of equipment and workers to water levels and waves, lack of
understanding of the difficulties of jetty bullnose work, and safety concerns are all
noted in the report.  *Id.* at 279-80.

Kerr was able to explain and improve its initial proposal through
clarifications that occurred on June 22, 2009 and July 20-21, 2009; through
discussions held on July 9, 2009; and through the submission of revisions to its
proposal on July 16, 2009.  AR at 266, 310-11, 315-16, Tabs 21, 23.  Nonetheless,
the Corps' concerns about key elements of Kerr's jetty stone placement plan
remained.  *See* AR at 278 (stating that "weaknesses and concerns continued to arise
during review of the resubmittal").  All of the deficiencies eventually
communicated to Kerr in the debriefing letter are present, in some form, in the
review of Kerr's initial proposal.[7]  The Corps identified the reach of the excavators,

---

[6]/  The solicitation describes elevations as being a certain number of feet above or under
Mean Lower Low Water (MLLW), such as +22 ft MLLW or -15 ft MLLW.  AR at 82-83.
MLLW is an elevation at a certain locality computed by averaging low tides for several years:
"[MLLW is] [t]he average of the lower low water height of each tidal day observed over [a
period of several years]."  National Oceanic and Atmospheric Administration,
http://tidesandcurrents.noaa.gov/mllw.html (last visited September 22, 2009).  In this opinion,
the court may refer to an elevation such as ten feet above MLLW as "+10 feet MLLW," or
simply as "+10 feet."

[7]/  In its initial review, the Corps did not highlight the fact that Kerr did not appear to
(continued...)

exposure to waves, hazardous working conditions and lack of understanding of the complexity of the work as justifying an unacceptable rating of Kerr's initial proposal.  *Id.* at 265-67.

In the end, the Corps had before it Kerr's initial proposal, Kerr's revisions to its proposal, and the Corps' records of discussions and clarifications.  Kerr did not indicate to the Corps how the revisions submitted on July 16, 2009 and the initial proposal should be reconciled.[8]  The Corps' instructions to Kerr did not impose a particular format for the submission of Kerr's revised technical proposal, *see* AR at 331 (discussions letter requesting that Kerr "submit a revised proposal that addresses the above [deficiencies and weaknesses] and contains all the information requested in the solicitation"); *see also id.* at 286 (record of discussions stating that "[e]ach offeror was instructed to respond to the July 1 letter [inviting each offeror to discussions] with an addendum to their original proposal"), but each offeror was required by the terms of the solicitation to present "clear, complete, concise, and straightforward responses to the evaluation factors," *id.* at 19.  In the absence of specific instruction from Kerr, the Corps was constrained to review both Kerr's initial technical proposal as well as what was labeled its "revised technical proposal," *id.* at 908, and evaluate the differing versions of Kerr's technical proposal as a "proposal and addendum."  *Id.* at 278 (SSB technical evaluation report) ("The following is a summary of the weaknesses noted during review of the proposal and addendum.").  Thus, when the court refers to Kerr's revised proposal, that reference is to the combination of Kerr's initial proposal, its July 16, 2009 proposal addendum, and other communications between Kerr and the Corps clarifying Kerr's jetty stone placement plan.[9]

---

[7](...continued)
have experience repairing a jetty bullnose.

[8]/  Kiewit, unlike Kerr, included an introduction to its revisions submitted on July 16, 2009 which precisely identified each revision to Kiewit's initial proposal, specifically indicating what was being changed by the revision.  AR at 799-800.

[9]/  Because Kerr did not indicate to the Corps which elements of its initial proposal were revised and superseded, and which elements of its initial proposal remained unchanged despite the submission of Kerr's "revised technical proposal," Kerr cannot now complain if the Corps relied principally on Kerr's proposal addendum, and subsequent clarifications, for its evaluation of Kerr's jetty stone placement plan.  In the absence of instruction from Kerr, such an approach

(continued...)

In sum, three aspects of Kerr's revised proposal, all related to its jetty stone placement plan, were found to be unacceptable by the Corps. Kerr's proposed use of excavators was viewed as unacceptable, because Kerr had not shown that this equipment had sufficient reach for Kerr's work plan. AR at 279. The Corps also noted that Kerr's management team lacked understanding of the complexity of jetty bullnose construction work. *Id.* at 280. Finally, Kerr's plan to work with excavators located at +10 feet MLLW during certain tide levels posed, in the Corps' view, unacceptable safety risks. *Id.* at 279-80. With the Corps' technical evaluation of Kerr's jetty stone placement plan, and the Corps' identified concerns regarding equipment capability, contractor understanding and safety in mind, the court now turns to plaintiff's allegations of error.

### B.    Plaintiff's Arguments

Kerr's challenges to the award to Kiewit can be classified either as alleged evaluation errors, in which the Corps did not correctly understand and rate Kerr's proposal, or alleged procedural errors, where the Corps did not abide by the process outlined in the solicitation or mandated by procurement law. The two evaluation errors alleged by Kerr relate primarily to the reach and utilization of its proposed excavators, and the types of work and equipment placement that Kerr proposed to undertake in response to varying tide levels. Kerr asserts, in addition, that five procedural errors marred this procurement. These include unequal ratings of offerors lacking jetty bullnose construction experience, rejection of Kerr's proposal for failure to meet minimum requirements unstated in the solicitation, failure to maintain price data confidentiality until the technical evaluation had been completed, unequal discussions with offerors, and failure to address in discussions

---

[9](...continued)
was reasonable and rational.

Kerr's lack of jetty bullnose construction experience.[10]  The court turns first to plaintiff's allegations of evaluation errors.

### 1.      Unacceptable Rating of Kerr's Plan to Use Excavators

Plaintiff argues that the Corps' unacceptable rating of its jetty stone placement plan, particularly with regard to that plan's utilization of excavators, was arbitrary and capricious.  Three findings of the Corps are described to be erroneous:  "The Corps['] decision that Kerr did not state that the crane would be used to reach rock beyond the reach of the excavators, its decision that the excavators would be used to place the weight of the [heavier] rock, and its decision that the excavators did not have the reach to assist the crane in placement at -20 [feet]."  Pl.'s Mot. at 32.  Defendant disagrees, and contends that the record fully supports the evaluation by the SSB of Kerr's jetty stone placement plan.

The court focuses primarily on the deficiency assigned to Kerr's plan by the SSB, because only a deficiency permits the Corps to reject a technical proposal as unacceptable.  The Corps placed great emphasis on its analysis of the reach of Kerr's proposed excavators, and found the maximum reach of these machines to be inadequate for the proposed use of the excavators in Kerr's jetty stone placement plan.  AR at 279.  The court finds no inaccuracies in the analysis of the maximum reach of the excavators performed by the Corps.  Kerr's revised technical proposal,

---

[10]/  In its reply brief, plaintiff suggests for the first time that the rating system set forth in the SSP does not support a deficiency rating for Kerr's lack of experience and lack of understanding of the contract work.  Pl.'s Reply at 12-13.  Normally, the court will not consider new legal theories presented in a reply brief.  *See Arakaki v. United States*, 62 Fed. Cl. 244, 246 n.9 (2004) ("The court will not consider arguments that were presented for the first time in a reply brief or after briefing was complete." (citing *Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002))).  Even if plaintiff's argument had been timely raised, there is no evidence in the record of the SSB's deliberations that either deficiency ratings or unacceptable ratings were irrationally applied to Kerr's revised technical proposal.  *See* AR at 275-76, 278-80, 634.  At worst, the SSB appears to have summarized its deliberations without perfect attention to the SSP definitions of the terms "weakness," "significant weakness" and "deficiency."  *See supra* note 3.  The Corps' rating of Kerr's understanding of jetty bullnose construction work as deficient and unacceptable, terms which are roughly synonymous in the SSP, was not irrational, according to the terms of the solicitation, and any minor discrepancies with the definitions of these terms in the SSP are at most *de minimis* errors that do not justify the court's intervention in this procurement.  *See also infra* note 12 and accompanying text.

including a manufacturer's specifications chart, is consistent with the Corps' finding that the larger excavator could attain at most 55 feet in horizontal reach, when working with stone at approximately -20 feet MLLW.  *See id.* at 279, 914, 922; *see also* Pl.'s Reply at 9 (stating that the "basic bucket charts show a reach of 55 feet of the required 60 feet to reach -20 feet MLLW").

According to the SSB, the jetty stone placement work would occur at a maximum distance of 60 feet and a maximum depth of -20 feet MLLW.  AR at 279.  This analysis is not contradicted by the drawings attached to the solicitation.  *See id.* at 258-59.  Although the solicitation's statement of work reports an estimated maximum work depth of -15 feet MLLW, *id.* at 83, the drawings in the solicitation warned that the "location of the [existing jetty stone] will vary, dependent upon site conditions at time of construction," *id.* at 258, and the statement of work itself warned that the summary "does not provide the technical detail . . . for the particular work activities [and that the summary] shall be used with all the other sections and the drawings to establish the total work requirements," *id.* at 82.[11]  The SSB found that Kerr's excavator, working at +10 feet MLLW, could not reach 60 feet horizontally, and 30 feet vertically, to work at -20 feet MLLW.  *Id.* at 279.  The court concludes that the SSB's analysis of the disparity between the reach of Kerr's proposed excavators, and the maximum reach required for jetty stone placement work, was not arbitrary or capricious.

Plaintiff raises two principal challenges to the Corps' deficiency rating of its plan to use excavators.  First, Kerr suggests that the SSB ignored a custom claw attachment allegedly discussed at the meeting held on July 9, 2009, which, according to plaintiff, would have extended the reach of the excavator to meet the Corps' requirements.  Second, Kerr argues that the SSB misunderstood the extent

---

[11]/  There are additional references to either stones or work at a maximum estimated depth of -15 feet MLLW in the solicitation, but these references do not establish a firm maximum depth for all work required by the contract.  *See* AR at 195 ("The elevation of the existing relic base stone will vary from neat lines shown on the drawings.  The depth for placement may vary from 0 feet MLLW to -15 feet MLLW."), 195-96 ("The elevation of the existing relic base stone may vary 0 feet MLLW to -15 feet MLLW from neat lines shown on the drawings."), 235 ("Maximum depth of construction is estimated at elevation -15 ft MLLW. Some reworking of the existing relic base and trunk stone is anticipated prior to placement of the new stone.").

to which its excavators would be used in the jetty stone placement plan. The court
will address each of these arguments in turn.

The records of the July 9, 2009 discussions meeting between Kerr and the
Corps contain no mention of a custom claw attachment. *See* AR at 287, 403. The
notes of the meeting, however, indicate that Mr. Edwards of the SSB told
representatives from Kerr to "include [certain details of excavator utilization] in
their revised proposal." *Id.* at 287. Similarly, the letter sent to Kerr regarding
discussions and the submission of a revised proposal specified that Kerr's revised
proposal must address the concerns noted by the Corps, and "must be in writing."
*Id.* at 331.

The text of Kerr's revised technical proposal contains no mention of a
custom claw attachment. The specifications provided for Kerr's larger excavator,
which were provided as part of Kerr's revised technical proposal, contain no
mention of a custom claw attachment. *See id.* at 920-22. The only statement
regarding the maximum reach of the larger excavator in Kerr's revised technical
proposal asserts that the excavator's "maximum reach [is] 50 feet." *Id.* at 914.

Assuming, *arguendo*, that the court would supplement the administrative
record with the declaration of Kerr's president, prepared during this litigation, Mr.
Kerr asserts that "Kerr informed Mr. Edwards and the others present [at the July 9,
2009 meeting] that the [larger] excavator would be assisting in placing stone using
a custom claw attachment . . . [and the] custom claw attachment would be of
sufficient length to perform the required task." Kerr Decl. ¶ 6. Even if true, Mr.
Kerr's recollection of this conversation does not alter the fact that the SSB had no
written documentation before it specifying that a custom claw attachment would
extend the reach of Kerr's larger excavator. It was not arbitrary or capricious for
the SSB to analyze the reach of Kerr's excavator based on the revised, written
proposal before it. To do otherwise would have been unfair to the other offerors,
who, like Kerr, all received instructions to submit their revised proposals in
writing. *Id.* at 318, 323, 327. Whether or not Mr. Kerr orally promised the Corps
on July 9, 2009 to use a custom claw attachment on Kerr's larger excavator, Kerr's
final written proposal did not do so, and the SSB's evaluation of that proposal was
not irrational for ignoring a verbal promise, if indeed such a promise was made.

Finally, Kerr disputes whether the reach of its excavators should have
produced an unacceptable rating because, according to plaintiff, the crane proposed

by Kerr "would be used to reach rock beyond the reach of the excavators." Pl.'s Mot. at 32. The court notes that the SSB relied on the written text of Kerr's revised proposal, as well as clarifications and discussions with Kerr, for its understanding of the role of the excavators in Kerr's jetty stone placement plan. *See* AR at 279. In the judgment of the SSB, Kerr proposed that its excavators would operate throughout the work zone, as far as 60 feet out and down to -20 feet MLLW. *Id.* The SSB also reasoned that when the excavators were loaded with heavier stones, the limited reach of these excavators would be a significant barrier to effective jetty stone placement. *Id.*

Certain portions of the record before the court could be read either to support a limited, auxiliary role for the excavators, as plaintiff now argues, or to support a more dynamic and primary role for Kerr's excavators, as the SSB discerned in Kerr's revised proposal. When interpreting the record before the court, adding emphasis and rephrasing the text of both Kerr's initial proposal and proposal addendum, plaintiff now plausibly argues that Kerr's excavators could have been used only within the limits of their reach, and Kerr's crane could, perhaps, have moved and placed the remaining jetty stone. The SSB, on the other hand, rationally read Kerr's revised proposal, as clarified, to show that Kerr over-relied on its excavators for work that was beyond their reach. The court reproduces excerpts from Kerr's proposal addendum here:

> Two excavators are planned to work with the crane for handling of relic stone and for assisting the crane in placement of new jetty stone. . . . The excavators will perform the re-handling or excavation of relic jetty stone to provide the proper foundation for the new jetty stone. The [larger excavator] will be used to handle relic jetty stone and assist the crane in preparing the foundation for [heavier] stone. [Both excavators] will assist the crane in orienting stones . . . depending on the maximum reach required . . . .

*Id.* at 913.

The notes from a clarification conversation with Kerr held on July 20, 2009 do not contradict the SSB's interpretation of Kerr's revised proposal. The Corps asked whether all jetty stone placement work would be done using excavators, and

Kerr responded that "[p]lacement work will not be accomplished using crane only. Using an excavator is necessary to arrange the stones properly. We don't think you can place the stone only using a crane." AR at 311; *see also id.* at 286 ("We do not think using a crane only can do the job properly."). The SSB concluded that "Kerr's proposed use of the excavators as essential to [heavier] bullnose rock placement is technically unacceptable." *Id.* at 279. The SSB remained convinced that Kerr's jetty stone placement plan depended on its excavators for too much of the work that could only be accomplished by a crane. Although that is not the only possible reading of Kerr's revised technical proposal, it is a rational one.

The court notes that the Corps' rejection of Kerr's jetty stone placement plan is entitled to deference, because technical ratings "involve discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss*, 77 F.3d at 449 (citations omitted). Here, the technical evaluation of Kerr's proposed use of excavators has not been shown to be irrational, arbitrary or capricious. Plaintiff's protest cannot be sustained for this reason.

### 2.    Rating of Kerr's Proposed Work Elevations in Relation to Tide Levels and Weather

Plaintiff also argues that the Corps erroneously gave Kerr's technical proposal an unacceptable rating for an aspect of its jetty stone placement plan related to the operation of excavators at +10 feet MLLW when tides would be at +6 feet MLLW. Pl.'s Mot. at 33-34. Plaintiff insists that Kerr did not propose to operate excavators at +10 feet when tides would be at +6 feet. Arguing from both Kerr's initial proposal and proposal addendum, as well as clarifications that occurred on July 20-21, 2009, plaintiff suggests that Kerr would only work at +10 feet if the tides were at or below +3 feet. *See* Pl.'s Reply at 11 ("When the Corps called to confirm the planned [+].05 to [+]3 feet range . . . , Kerr definitively and clearly confirmed that tide range for working at [+]10 feet MLLW.").

Unfortunately for plaintiff's argument, the record does not clearly show that Kerr's revised technical proposal set +3 feet MLLW as a maximum tide level for operating excavators at +10 feet MLLW. The discussions letter sent to Kerr noted a problem with Kerr's proposed jetty stone placement schedule, questioning whether adequate time was allowed for bullnose stone placement: "[this bullnose stone placement requirement] may affect how the work plan will need to be executed and within what tide windows." AR at 330. At the discussions meeting

on July 9, 2009, a Kerr representative noted that Kerr "had calculated the different amounts of jetty stone required in each section [of the jetty] and . . . incorporated those amounts into the schedule." *Id.* at 287.

In Kerr's proposal addendum, Kerr noted that "[d]uring the proposed months of July, August and September, low tides range from 0.5 to 3 feet above MLLW." AR at 914.  The court notes that this sentence reports the predicted level of water at the jetty at low tide on certain days, not a construction "tide window" with a maximum tide level of +3 feet.  Predictions of water levels at low tide on specific days are available on the website maintained by the National Oceanic and Atmospheric Administration, at http://tidesandcurrents.noaa.gov, and it is clear that Kerr consulted such charts for clarifications provided to the Corps, which became part of Kerr's revised technical proposal.  *See* Pl.'s Mot. at 34 ("Kerr also supplied the Corps with a handwritten chart . . . based off of a NOA[A] website.").  Kerr's revised proposal refers both to low tides, and low tide cycles, AR at 914, but these terms are not synonymous.  A distinction must be made between a predicted water level for a low tide on a certain day (occurring at a distinct moment known as low tide) and a low tide cycle, which apparently refers, in Kerr's revised proposal, to a span of time at or near low tide during which water levels will not rise above a certain level, and during which time certain work can be accomplished.  *See id.* at 824 ("Work will be scheduled to coincide with the best low tides during the daylight hours . . . ."); *id.* (stating that certain work "will occur at or near low tide to minimize, as much as possible, the depth of water [where that work will occur]"); *id.* at 914 (stating that "work at elevation [+]10 [feet] . . . is scheduled during low tide cycles").

On July 20, 2009, the Corps requested clarification of the low tide construction window from Kerr:  "Work is scheduled during low tide cycle.  Is low tide the 0.5 to 3?"  AR at 310.  Mr. Kerr agreed, and added that "[w]e calculated the number of hours at low tide during bullnose construction.  We will send our calculated numbers."  *Id.*  The calculations Kerr sent to the Corps were in a chart labeled "Tide Cycles," indicating for each work day in July, August and September expected water elevations (Elev) and hours available for work (Work Time).  *Id.* at 312-14.  There are fifty-one construction days where water elevations are described as ranging up to +6 feet, and only seven construction days with water elevations rising to less than +6 feet.  *Id.* at 312-14.  Each construction day is described as providing at least six hours of work time at the water elevations indicated, with some days having as much as fourteen hours of work time.  *Id.*  Based on this "tide

cycles" chart predicting water elevations and working hours, which was provided by Kerr to the Corps as a clarification of its revised technical proposal, it was rational for the Corps to conclude that Kerr's low tide construction window included operating excavators at +10 feet MLLW when the tide was at or near +6 feet MLLW.

A final clarification provided by Kerr on July 21, 2009 does not contradict the SSB's analysis of the tide elevation issue.  Kerr submitted a written clarification of its plan to operate excavators at +10 feet MLLW.  In Kerr's memorandum titled "Response to Additional Questions," the Corps' question to Kerr is reported as "What is the maximum tide elevation to have if you have machinery working at elevation [+]10 [feet]?"  AR at 315.  Kerr answered somewhat ambiguously that "[t]he maximum tide ele[]vation is the combination of the tide elevation plus swell, equal to but not greater than elevation [+]9 [feet]." *Id.*  Based on this final clarification, Kerr's initial proposal, the proposal addendum, and the tide cycles chart provided by Kerr in response to the Corps' concerns raised on July 9, 2009, the SSB's analysis of the tide elevation issue has not been shown to be irrational.

Plaintiff also argues that if tide levels increased to a dangerous height while its machines were operating at +10 feet MLLW, the excavators were mobile enough to retreat to safety.  Pl.'s Reply at 14; *see also* AR at 914 ("When tides rise and/or weather conditions present unsafe working conditions, these machines will retreat from this elevation and continue work on the jetty from a higher elevation . . . .").  The SSB judged this plan to pose an unacceptable risk to contract performance, concluding that "the +6 ft. [tide] elevation proposed may frequently be unsafe and unsuitable under normal wind and wave conditions, let alone on windy or stormy days at the jetty."  AR at 280.  This is a rational, technical evaluation rating within the Corps' discretion that this court will not disturb.

Finally, plaintiff raises, in two brief sentences, another challenge to the Corps' analysis of the tide elevation issue.  Plaintiff notes that the solicitation contains a provision that bars certain stone placement work from occurring when tides are above +4 feet MLLW.  Pl.'s Mot. at 33 (citing AR at 199).  According to plaintiff, the SSB read Kerr's proposal to include this type of work when tides are at +6 feet, and such a reading could not be rational.  *Id.* at 33-34.  Plaintiff's cursory presentation of this argument does not show that the Corps' analysis of Kerr's revised proposal is irrational.

The water depth restriction cited by plaintiff is for "Construction of the portion of toe berm below elevation +2 ft MLLW [involving one type of jetty stone]." AR at 199. Plaintiff has not explained whether this type of work constitutes any, part, or all of the work that Kerr planned to accomplish with excavators at +10 feet MLLW, and has not pointed to or explained portions of the record which describe this work in Kerr's revised proposal. If the court cannot determine from plaintiff's argument how this particular work is described in Kerr's proposal, and how other work, if any, would be accomplished by excavators at +10 feet, it is impossible to declare that the Corps' analysis of Kerr's proposal makes an irrational assumption which conflicts with a solicitation requirement. Plaintiff's argument regarding the Corps' allegedly irrational assumption as to Kerr's revised proposal fails because plaintiff has not met its heavy burden of showing that the Corps' award decision was irrational. *Impresa*, 238 F.3d at 1333.

The SSB rationally determined that Kerr's jetty stone placement plan proposes work in close proximity to tides at or near +6 feet MLLW. The Corps concluded that this aspect of Kerr's proposal was unsafe and unacceptable. Based on this record and plaintiff's arguments, the court finds nothing irrational in the Corps' analysis of Kerr's understanding of how tide elevations affect safe working elevations on the jetty. For this reason, plaintiff's second challenge to the Corps' evaluation of Kerr's revised technical proposal fails.

### 3.   Unequal Ratings of Offerors Lacking Jetty Bullnose Construction Experience

In Steelhead's debriefing letter, the Corps indicated that Steelhead's proposal contained a weakness related to a lack of jetty bullnose construction experience. AR at 398-99. Similarly, in Tapani's debriefing letter, the Corps indicated that Tapani's proposal contained a weakness related to a lack of jetty bullnose construction experience. *Id.* at 394-95. Kerr's debriefing letter, on the other hand, indicated that Kerr's proposal contained a deficiency related to Kerr's lack of jetty bullnose experience. *Id.* at 390, 392. The Corps stated that

> There is no indication that the proposed project management team has experience placing stone on the bullnose of jetties. This is coupled with the apparent failure of Kerr to understand the significant challenges of the bullnose jetty work and consequently to be able to

> perform the work as required.  This combination of lack
> of experience and understanding results in an
> unacceptable rating for the management plan.

*Id.* at 392.  Kerr now asserts that these unequal ratings for the same lack of experience, *i.e.*, a weakness for Steelhead and Tapani, but a deficiency for Kerr, show arbitrary and capricious decision-making on the part of the Corps.  Pl.'s Mot. at 17-18 (citing *AshBritt, Inc. v. United States*, 87 Fed. Cl. 344, 367 (2009)).

The debriefing letters, however, are not the best evidence of the Corps' official evaluation of the unsuccessful offerors' revised proposals.[12]  *See, e.g.*, *Femme Comp Inc. v. United States*, 83 Fed. Cl. 704, 732 n.18 (2008) (reviewing the government's proposal evaluation reports rather than its debriefing slides for possible errors in a technical evaluation); *Rig Masters, Inc. v. United States*, 70 Fed. Cl. 413, 424 (2006) (reviewing the record of a proposal's evaluation by the government, rather than focusing on conflicting evidence of the information communicated in a debriefing).  Both the Source Selection Memo and the Source Selection Technical Evaluation Report found the proposals of Steelhead, Tapani and Kerr to contain deficient and unacceptable management plans, at least in part due to the lack of prior, successful jetty bullnose construction experience.  *See* AR at 276, 280-82.  It does not appear to the court that Kerr's negative rating for lack of jetty bullnose construction experience was unequal to the ratings of other offerors.  Thus, the court finds no merit in plaintiff's unequal ratings argument.

### 4.     Rejection of Kerr's Proposal for Failure to Meet Minimum Requirements Unstated in the Solicitation

Plaintiff argues that the Corps evaluated Kerr's proposal for criteria that were not stated in the solicitation.  *See* Pl.'s Mot. at 20 ("Here, the Corps imposed multiple minimum requirements upon Kerr that were either not in the Solicitation or which were contrary to the Solicitation.").  By statute, regulation and caselaw,

---

[12]/ Defendant argues that the debriefing letter sent to Kerr shows that the Corps considered Kerr's lack of jetty bullnose experience to be first a weakness, and, when viewed in conjunction with Kerr's jetty stone placement plan, evidence of a deficiency in Kerr's management plan.  Def.'s Mot. at 24-25.  This is indeed a reasonable reading of the debriefing letter, and consistent with other evidence of the Corps' rational evaluation of Kerr's management plan.

government agencies must evaluate proposals based solely on the evaluation criteria stated in a solicitation. *See, e.g.*, 10 U.S.C. § 2305(b)(1) (2006); 48 C.F.R. § 15.305(a) (2008); *Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 386 (2003) (stating that "agencies must evaluate proposals and make awards based on the criteria stated in the solicitation"), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004). "In order to show entitlement to relief on a claim that the agency used undisclosed evaluation factors, [a] plaintiff must prove that the government evaluated the proposals received on a significantly different basis than announced in the solicitation and that [the] plaintiff has been prejudiced as a result." *Hydro Eng'g, Inc. v. United States*, 37 Fed. Cl. 448, 471 (1997) (citing *CACI Field Servs., Inc. v. United States*, 13 Cl. Ct. 718, 728 (1987), *aff'd*, 854 F.2d 464 (Fed. Cir. 1988)).

Plaintiff points to four evaluation criteria that, in its view, were not mentioned in the solicitation but were applied to Kerr's technical proposal. These criteria are as follows: (1) a minimum level of jetty bullnose construction experience; (2) a minimum safe working elevation; (3) a minimum freeboard (height above water level) for equipment operation; and, (4) an ability to work at -20 feet MLLW, as opposed to -15 feet MLLW. Pl.'s Mot. at 20-22. Plaintiff suggests that all of these evaluation criteria were considered by the Corps to be mandatory minimum requirements, and that these minimum requirements were nowhere stated in the solicitation. *Id.* at 19-22.

Plaintiff relies on *Isratex, Inc. v. United States*, 25 Cl. Ct. 223, 229 (1992), among other authorities, for the unremarkable proposition that a solicitation should put offerors on notice of the mandatory minimum requirements which, if they are lacking in a proposal, would lead to rejection of the proposal. In *Isratex*, for example, it was clear that the agency misled offerors into believing that certain evaluation factors were equally weighted and that the factors were not mandatory minimum requirements. *Id.* (stating that despite the presumption that solicitation factors would be accorded equal weight, the agency "neither stated the relative importance of the subfactors nor equally weighed the subfactors"). In *Isratex*, passing a certain test became a mandatory minimum requirement, and the court proceeded to examine the language of the solicitation to determine whether "the solicitation put offerors on notice that passing [that] test was a mandatory requirement of the solicitation." *Id.* In *Isratex*, the solicitation did not clearly state that failing a certain test would necessarily be cause for rejection of a proposal, and the court enjoined the contract award because of this prejudicial violation of

procurement law.  *Id.* at 231 (finding a clear and prejudicial violation of 10 U.S.C. § 2305).

The situation here, however, is unlike *Isratex*, where an agency imposed a quantified result on a particular test as a mandatory minimum requirement.  Kerr's revised proposal was rejected because of the unacceptable aspects of its jetty stone placement plan in the technical, performance risks and management plan factors. All of these factors are set forth in the solicitation, and Kerr was put on clear notice that its technical proposal would be reviewed for its technical merit, in conjunction with its safety and management plan.  To the court, this evaluation process would necessarily include an examination of all aspects of Kerr's plan for jetty stone placement, including proposed equipment utilization and placement.  That during the course of this evaluation, the SSB would evaluate Kerr's relevant experience, Kerr's understanding of the complexity of the work, Kerr's proposed working elevations for machinery, and the reach of Kerr's excavators compared to the furthest limits of jetty stone placement work, is reasonable and thoroughly unsurprising.

As this court has stated, "[w]hen weighing the merits of a proposal under a specific evaluation factor, an agency may consider all matters that offerors would reasonably have believed to be within the scope of the factor."  *Forestry Surveys & Data v. United States*, 44 Fed. Cl. 493, 497 (1999) (internal quotations and citation omitted).  Furthermore, "agency evaluation personnel are given great discretion in determining the scope of an evaluation factor."  *Id.* at 499 (citation omitted).  As this court has often found, "a solicitation need not identify each element to be considered by the agency during the course of the evaluation where such element is intrinsic to the stated factors."  *Banknote*, 56 Fed. Cl. at 387 (internal quotations and citations omitted).  What plaintiff suggests are mandatory minimum requirements are merely the intrinsic elements of a technically sound, safe and acceptable proposal for jetty stone placement.  The court will not infringe upon the Corps' discretion as to the scope of its evaluation of Kerr's technical proposal. The court finds no unstated mandatory minimum requirements in the Corps' evaluation of Kerr's proposal, and for this reason, plaintiff's challenge on this ground also fails.[13]

---

[13]/ One evaluator's notes which comment that three feet is a minimum safe freeboard for machinery operation at the water's edge do not, in the court's view, indicate that the Corps failed

(continued...)

### 5.    Failure to Maintain Price Data Confidentiality Until the Technical Evaluation Had Been Completed

Plaintiff asserts that the Corps violated the SSP and FAR 15.305(a)(4), 48 C.F.R. § 15.305(a)(4), when it shared Kiewit's price information with members of the SSB before the technical evaluation of revised technical proposals was completed.  Pl.'s Mot. at 23.  Defendant asserts that the Corps properly maintained the confidentiality of price information during the technical evaluation of initial proposals, and subsequently properly maintained the confidentiality of revised price information during the evaluation of revised technical proposals.  Def.'s Mot. at 33.  Defendant's argument neatly avoids the more pertinent question, whether the sharing of *any* price information with the SSB before they completed their technical evaluations of revised proposals was permissible under procurement law, regulation or the terms of the solicitation.

As to the solicitation, Kerr does not allege that the disclosure of Kiewit's price information to the SSB on July 9, 2009 was in violation of any provision set forth or referenced in that document.  As mentioned *supra*, the solicitation briefly discusses the evaluation of price proposals, and states that "only those proposals that are found to be technically acceptable will be evaluated on price."  AR at 23.  Kiewit's initial technical proposal had been found acceptable, and the Corps was then free, by the terms of the solicitation, to evaluate Kiewit's price for the contract before entering into discussions with Kiewit.  The solicitation further states that "[p]rice will also be a factor in establishing the competitive range prior to discussions (if held)."  *Id.*  The letters to offerors inviting them to discussions meetings noted that these offerors were "in the competitive range."  *Id.* at 318, 321, 325, 329.  The discussions with Kiewit, which included the topic of Kiewit's price, were permissible under the solicitation even if those discussions were held in the presence of two members of the SSB.

It is a closer question as to whether the presence of two SSB members at the meeting discussing price concerns with Kiewit was permissible under the SSP.  It is clear that price information was to be withheld from the SSB until initial

---

[13](...continued)
to give notice of a mandatory minimum requirement in the solicitation.  *See* Def.'s Mot. at 30-31.  Instead, the SSB evaluated Kerr's proposal for the safety subfactor of the performance risks factor, which was clearly noted in the solicitation.  *See* AR at 22.

technical evaluations were completed.  AR at 350.  The SSP could also be read to require that price information not be released to SSB members, even if discussions were opened with offerors, until the final technical evaluations of proposals had been completed.  *Id.* (stating that the SSB Chairperson "[e]nsures the price proposals are not released to anyone conducting the evaluation of technical proposals until that evaluation is completed and the technical evaluation findings are documented").  Assuming, *arguendo*, that the SSP was violated when Kiewit's price information was discussed on July 9, 2009, the court must determine whether that was a significant and prejudicial error justifying judicial intervention.

As this court has stated, the requirements of a Source Selection Plan do not usually establish enforceable rights for a disappointed bidder.  *See ManTech Telecomms. & Info. Sys. Corp. v. United States*, 49 Fed. Cl. 57, 67 & n.15 (2001) (stating that a "Source Selection Plan has little, if any, bearing in defining the rights of the parties under [a] Solicitation" and generally does not afford a protestor rights before this court) (citations omitted).  A violation of a Source Selection Plan would, however, constitute a significant error if it "deprived [a] plaintiff of the opportunity to have its proposal considered fairly and honestly."  *United Int'l Investigative Servs., Inc. v. United States*, 41 Fed. Cl. 312, 322 (1998).  The court sees no such error here.

The presence of SSB members during the discussion of one offeror's price information was, in the context of this procurement, a *de minimis* error of no consequence.  *Grumman Data*, 88 F.3d at 1000 (noting that *de minimis* errors in the procurement process do not justify relief).  There is no evidence in the record that the SSB considered Kiewit's price information when they were weighing whether or not Kerr's technical proposal was acceptable.  The SSB consistently found fault with Kerr's jetty stone placement plan, citing generally the same concerns, both before and after Kiewit's price information was disclosed to two members of the SSB.  There is no indication that Kiewit's price information, in any way, affected Kerr's technical evaluation.[14]

---

[14]/  Similarly, even assuming, *arguendo*, that the disclosure of Kiewit's price information violated FAR 15.305(a)(4), the court sees such a violation as *de minimis*.  That regulation states that "[c]ost information may be provided to members of the technical evaluation team in accordance with agency procedures."  48 C.F.R. § 15.305(a)(4).  Whether or not the Corps violated agency procedures when two members of the SSB learned certain details of Kiewit's

(continued...)

Finally, even if some violation of law or regulation occurred when the SSB members were made privy to Kiewit's price information, plaintiff has made no allegation that it was specifically harmed by this disclosure.  As the Federal Circuit has recently stated, a bid protester must show how the government's error "interfered with its ability to receive the contract award."  *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1380 (Fed. Cir. 2009).  Kerr's chances of winning this contract were unaffected by the disclosure of Kiewit's price information to the SSB.  In other words, Kerr has shown no prejudice related to this alleged flaw in the procurement.  For these reasons, the court cannot justify any intervention in this procurement based on the disclosure of Kiewit's price information to SSB members.[15]

### 6.    Unequal Discussions with Offerors

The government, when conducting discussions with offerors in the competitive range, may not "engage in conduct that . . . [f]avors one offeror over another."  48 C.F.R. § 15.306(e) (2008).  This regulation does not permit a procuring agency to engage in unequal discussions, where a crucial and advantageous piece of information is withheld from some but not all offerors remaining in the competition.  *See, e.g.*, *Metcalf Constr. Co. v. United States*, 53 Fed. Cl. 617, 634-35 (2002) (holding, in that case, that "the bidders were treated unequally where one bidder was advised, in no uncertain terms, not to exceed the budget ceilings, and a second bidder under identical circumstances was not").  Nonetheless, "agencies are not required to conduct identical discussions with each offeror."  *Femme Comp*, 83 Fed. Cl. at 735 (citing *WorldTravelService v. United States*, 49 Fed. Cl. 431, 440 (2001)).  Rather, the procuring agency should tailor discussions to each offeror's proposal.  *WorldTravelService*, 49 Fed. Cl. at 440.

---

[14](...continued)
price proposal, there is no evidence in the record that this alleged error made any difference in the evaluation process, or harmed Kerr.

[15]/  Plaintiff also asserts that the disclosure of Kiewit's price information violates a "representation made to Kerr" concerning the security of price information contained in offerors' proposals.  Pl.'s Mot. at 23; Pl.'s Reply at 6.  Although plaintiff has not elaborated on the legal consequences of this aspect of the disclosure of Kiewit's price information, the court finds that any error related to representations made by the Corps has not prejudiced Kerr, and that no relief is due plaintiff as a result of the Corps' disclosure of Kiewit's price information.

Here, plaintiff asserts that another offeror, Tapani, was given information about a safe working elevation on the jetty bullnose, *i.e.*, +22 feet MLLW, that was undisclosed to Kerr. Pl.'s Mot. at 25. Plaintiff also argues that Tapani revised its technical proposal based on this information. *Id.* (citing AR at 1297). In Kerr's revised jetty stone placement plan, Kerr described its excavators as working at +10 feet MLLW. AR at 913-14. Kerr received an unacceptable rating in the safety subfactor because Kerr proposed an unsafe working elevation for its excavators. *Id.* at 280. Plaintiff concludes that the Corps impermissibly favored Tapani over Kerr in the discussions held July 9, 2009. Pl.'s Mot. at 25.

The Corps sent discussions letters to the three offerors whose proposals had been rated technically unacceptable, and in each of these letters, notice was given concerning the risks of working on the jetty bullnose at lower elevations:  "Added risk of equipment operation at a lower elevation at the head of the jetty was not addressed [in your proposal]."[16] AR at 322 (Tapani letter), 326 (Steelhead letter), 330 (Kerr letter). In the talking points memoranda prepared for the discussions meetings on July 9, 2009, the Corps noted that Kerr would be asked to "provide more detail on the [jetty stone] placement plan and how they intend to utilize the equipment listed"; Steelhead would be asked to "provide further [jetty stone] placement detail . . ."; and, Tapani would be asked to "submit a more detailed and revised [jetty stone] placement plan." *Id.* at 334, 338, 340. It is clear from the record that the Corps' written communications to the offerors concerning safe working elevations were fundamentally equal, and that pre-negotiation goals for discussions envisioned fair and equal discussions, tailored to the individual proposals that the Corps had reviewed and evaluated.

On July 9, 2009, the meeting with Kerr began at 9:00 a.m. AR at 286. The notes from the meeting indicate that the letter to Kerr cited above was "reviewed in detail." *Id.* In the court's view, this notation means that Kerr was reminded at the discussions meeting that work on the jetty bullnose at lower elevations was an "added risk." Indeed, the notes report that "Mr. Kerr stated based on the July 1 letter, it appeared that the Corps w[as] concerned about the safety of operating equipment at 10 feet (ft) elevation." *Id.* at 287. Kerr volunteered that it was revising its proposal to use a larger crane, at +22 feet MLLW, but noted that Kerr

---

[16]/ Kiewit's discussions letter addressed other issues, because its proposal had been rated technically acceptable. AR at 318-19.

would still have an excavator at lower elevations.  *Id.*  The Corps directed Kerr "to include that in their revised proposal."  *Id.*

The Tapani meeting began at 1:00 p.m., and was the last discussions meeting held that day.  AR at 289.  Tapani described a revised "5-stage plan to place jetty stones . . . [which would] use the crane at the [+]10 ft level . . . ."  *Id.*  The Corps noted that it "had serious concerns regarding the safety of working at the 10 ft elevation."  *Id.*  When Mr. Tapani specifically asked what elevation was considered safe, "Mr. Edwards stated that the top of the jetty crest at elevation 22 ft was considered relatively safe."  *Id.*  The meeting moved on to other topics, including the size of the crane needed for the job.  *Id.*

The record shows that the Corps addressed the risks of working at +10 feet MLLW with both Tapani and Kerr.  Tapani's safe working elevation question arose when Tapani presented details of its revised plan to station its small crane, not excavators, at +10 feet MLLW.[17]  The only significant difference between these discussions is that Tapani asked for and received guidance as to a safer elevation, +22 feet.  Because both discussions addressed the safety risks of working at +10 feet, the court must decide whether the additional comment from the Corps stating that +22 feet "was considered relatively safe" made these discussions unequal, and, if so, whether this error was prejudicial to Kerr.

A more typical example of unequal discussions invalidating a procurement is where the successful bidder received a helpful critique of its initial proposal during discussions, improved its proposal in that respect, and received a higher score for its proposal than the protestor, who received no warning that improvement of that aspect of its proposal was necessary.  For example, in a bid protest sustained by the Government Accountability Office (GAO), "the majority of the difference in technical scores between the[] proposals" of the winning bidder and the protestor could be attributed to an advantage gained through unequal discussions, and GAO therefore concluded that "[t]he agency thus treated the offerors unequally on this point, with the awardee receiving a prejudicial competitive advantage as a result."  *M&S Farms, Inc.*, B-290599, 2002 CPD ¶ 174, 2002 WL 31323424, at *7 (Comp. Gen. Sept. 5, 2002).  This court has also

---

[17]/ Tapani's initial and revised jetty stone placement plans were both criticized for being incomplete.  *See* AR at 272-73, 282.

condemned unequal discussions which produce a comparative, prejudicial advantage for contract awardees. *See, e.g.*, *AshBritt*, 87 Fed. Cl. at 377 (noting that two successful offerors in that case were favored by unequal discussions which permitted them to remedy a significant omission in their proposals, whereas the protestor was not alerted to the same omission during discussions and received a downgraded score for that omission); *Gentex Corp. v. United States*, 58 Fed. Cl. 634, 653 (2003) (holding that unequal discussions, along with other procurement errors, constituted prejudicial and impermissible favoritism benefitting the contract awardee in that case).

Here, however, the facts are not analogous, because there is no allegation, or the slightest indication in the record, that unequal discussions favored Kiewit, the contract awardee. More specific safety information provided Tapani cannot be construed as giving Kiewit a comparative advantage over Kerr. For this reason, the court finds that even if the more specific safety information provided to Tapani constituted unequal discussions in this procurement, the alleged error was not prejudicial to Kerr and the alleged procurement error cannot justify judicial intervention under the binding law of this circuit.[18] *Labatt*, 577 F.3d at 1379 (stating that prejudice is shown when the protestor points to a procurement error which "resulted in a contract award to a bidder who was unfairly advantaged by the government's error"); *see also OMV Med. Inc.; Saratoga Med. Ctr., Inc.*, B-281387, B-281387.2, B-281387.3, B-281387.4, 99-1 CPD ¶ 52, 1999 WL 140177, at *6 (Comp. Gen. Feb. 3, 1999) (holding that the protestor "could not have been prejudiced by these allegedly improper [unequal] discussions, since the agency did not hold such discussions with the awardee").

### 7. Failure to Address in Discussions Kerr's Lack of Jetty Bullnose Construction Experience

Plaintiff argues that the Corps did not engage in meaningful discussions with Kerr, because the subject of Kerr's lack of jetty bullnose construction experience

---

[18]/ In its reply brief, plaintiff suggests for the first time that there was an additional instance of unequal discussions, when lack of jetty construction experience was raised with Steelhead, but not with Kerr. Pl.'s Reply at 13 (citing AR at 288). Even if this argument had been timely raised, *see supra* note 10, there could not have been prejudicial error, because the court has before it no allegation or evidence of unequal discussions giving a competitive advantage to Kiewit, the contract awardee.

was not addressed in the July 9, 2009 meeting.  Pl.'s Mot. at 26.  Plaintiff relies on FAR 15.306(d)(3), 48 C.F.R. § 15.306(d)(3) (2008), for the principle that discussions must address deficiencies in proposals within the competitive range of a competition.  *Id.*  This regulation provides that

> At a minimum, the contracting officer must . . . indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond.  The contracting officer also is encouraged to discuss other aspects of the offeror's proposal that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award.  However, the contracting officer is not required to discuss every area where the proposal could be improved.  The scope and extent of discussions are a matter of contracting officer judgment.

48 C.F.R. § 15.306(d)(3).[19]

Defendant contends that Kerr was given adequate notice of problems with its management plan for jetty stone placement, so that specific mention of Kerr's lack of jetty bullnose construction experience was not necessary.  Def.'s Mot. at 25-26.  Defendant avers that Kerr was put on notice of the weakness in Kerr's construction experience by the July 1, 2009 discussions letter.  *Id.* at 25 (citing AR at 331).  The court agrees that the letter noting Kerr's apparent lack of understanding of the project, and questionable plans for equipment utilization, satisfies FAR 15.306(d)(3).

The evaluation criteria of an offeror's management plan, as set forth in the solicitation, include "the qualifications, experience, and accomplishments (in

---

[19]/  All of the individual members of the SSB assigned Kerr an acceptable rating for past performance on relevant contracts, both for Kerr's initial proposal and for Kerr's revised proposal.  AR at 634-35.  Thus, "adverse past performance" was not an issue in Kerr's proposal, and discussion of Kerr's performance ratings on other contracts was not required by FAR 15.306(d)(3).

resume format) of the offeror's project team," and the solicitation informed offerors that "[a] good plan would demonstrate that the offeror's project team is well able to do this work." AR at 23. The consensus evaluation of Kerr's initial proposal, as to the management plan factor, focused on lack of understanding and a questionable equipment utilization plan. *Id.* at 266. At least in part for these reasons, the Corps noted significant weaknesses and deficiencies in Kerr's management plan, as it was described in Kerr's initial proposal. *Id.*

In the letter sent to Kerr regarding the discussions to be held on July 9, 2009, the Corps enumerated its concerns with Kerr's management plan, which are reproduced here in relevant part:

> b.   The Placement plan/work execution plan seems vague and not appropriate to complete the job as specified.
> c.   There appears to be a lack of understanding of the complexity of the work.
> d.   The equipment capability for job execution is questionable, possibly leading to unsafe working conditions.

AR at 331. Although no mention of any particular type of construction experience, or lack thereof, is included in this communication, the "qualifications, experience, and accomplishments" of individual members of Kerr's management team constitute the primary evaluation criteria listed in the solicitation for the management plan factor. Thus, in the court's view, Kerr was put on notice that the Corps questioned Kerr's understanding of the complexity of this project, and questioned Kerr's understanding of safety issues in jetty construction, and specified that these flaws weakened Kerr's management plan.

In the discussions held on July 9, 2009, and in further communications with Kerr, the Corps discussed the most significant weaknesses in Kerr's jetty stone placement plan. *See* AR at 278-80, 286-87, 310-11. These communications failed to alter the Corps' negative assessment of Kerr's understanding of the complexity of the project. *Id.* at 280. The Corps concluded that "Kerr appears to fail to understand the significant challenges of bullnose jetty work and consequently to be able to perform the work as required. This lack of understanding demands a technical non-acceptability rating on [the management plan factor]." *Id.* The

Corps noted that Kerr had previous experience in jetty construction, but had "no experience repairing bullnoses of jetties." *Id.*

In the court's view, the record of discussions and clarifications with Kerr shows that the Corps addressed the significant weaknesses and deficiencies in Kerr's management plan, as this plan was described in Kerr's initial and revised proposals.  Kerr was put on notice that the Corps did not see evidence that Kerr's management team  understood the complexities of the project, or that they had a good plan for completing the required contract work.  As to Kerr's lack of jetty bullnose construction experience, this weakness appears to have contributed to the deficiencies of Kerr's revised technical proposal, but did not constitute, by itself, a significant weakness or deficiency.[20]  AR at 280.  The Corps assigned an unacceptable rating to Kerr's management plan because of "the above concerns stated over the dependence upon the excavators and upon the safety of . . . its working level," not solely because of Kerr's lack of jetty bullnose construction experience.  *Id.*

For discussions to be meaningful, they must "generally lead offerors into the areas of their proposals requiring amplification or correction, which means that discussions should be as specific as practical considerations permit." *Advanced Data Concepts, Inc. v. United States*, 43 Fed. Cl. 410, 422 (1999) (internal quotations and citations omitted), *aff'd on other grounds*, 216 F.3d 1054 (Fed. Cir. 2000).  Nonetheless, a "contracting officer has broad discretion in conducting discussions." *Id.* (citation omitted); *see, e.g.*, *WorldTravelService*, 49 Fed. Cl. at 439 (stating that "both the decision to conduct discussions and the scope of any discussions are left to the judgment of the contracting officer") (citations omitted).  If a protestor alleges that a specific significant weakness or deficiency in its proposal was not addressed during discussions, the court examines the record of discussions to determine whether or not the protestor was given notice of the

---

[20]/  The debriefing letter sent to Kerr contains somewhat conflicting references to Kerr's lack of jetty bullnose construction experience, listing this lack of experience as a deficiency in a summary chart, as a weakness in a bulleted list of weaknesses, and as a part of a "combination of lack of experience and understanding" that "results in an unacceptable rating for [Kerr's] management plan," in a bulleted list of deficiencies.  AR at 390, 392.  The court relies on the Corps' evaluation report as the best record of the Corps' rating of Kerr's management plan, but notes that the debriefing letter sent Kerr is not inconsistent with other evidence of the Corps' evaluation of Kerr's revised technical proposal.  *See supra* note 12 and accompanying text.

serious flaw in its proposal.  *See, e.g.*, *Cubic Def. Sys., Inc. v. United States*, 45 Fed. Cl. 450, 471 (1999) (holding that the discussions under review in that case were adequately meaningful, because the protestor "was placed on notice of significant identified management problems").  A slight variation between the wording of the technical evaluation of a proposal's deficiency and the content of the discussions held with the offeror will not suffice to show that the discussions were not meaningful – the agency must have failed to give notice of an "independent weakness."  *See, e.g.*, *Advanced Data Concepts*, 43 Fed. Cl. at 422-23 (holding that the wording of a "technical evaluation's criticism" of a proposal reflected a failure of the proposal to adequately remedy a weakness addressed during discussions, but did not identify "an independent weakness" that was impermissibly omitted from discussions).

Under this standard, the invitation to discussions letter sent to Kerr, the meeting held on July 9, 2009, and subsequent clarifications, along with the solicitation's description of the evaluation criteria for the management plan factor, gave adequate notice to Kerr that its understanding of the complexity of jetty bullnose construction was not acceptable to the Corps, and that Kerr's revised proposal and further submissions should demonstrate its understanding of jetty bullnose construction.  Kerr failed to sufficiently address the Corps' concerns, despite ample opportunity to do so.  If Kerr possessed, or could obtain, jetty bullnose construction experience, it was on notice that the revised proposal should contain evidence of that experience, as well as evidence of an enhanced comprehension of jetty bullnose construction.

GAO has held that a offeror was on notice of significant weaknesses in its work plan through information provided by the evaluation criteria listed in the solicitation, in combination with a request from the agency for assurance regarding the "capacity" of the contractor.  *See Du & Assocs., Inc.*, B-280283.3, 98-2 CPD ¶ 156, 1998 WL 892043, at *6 (Comp. Gen. Dec. 22, 1998).  One of the ratings that hurt Du's chances to win a contract in that procurement concerned its ability to manage subcontractors.  *Id.* at *2.  The only notice of this flaw in Du's proposal was found in the solicitation, which required that proposals contain information regarding "the management of subcontractors," and in a discussions letter from the agency, which requested "assurance that the company has the capacity . . . to perform the contract."  *Id.* at *1-*2.  No specific mention of the management of subcontractors was made during the discussions meeting held with Du.  *Id.* at *6.  GAO held that when the agency requested "assurances that the firm has the

34

'capability' to perform the contract [, this] served to sufficiently lead [Du] into the area of organizational structure and subcontractor management so as to support a conclusion that discussions were meaningful in this regard." *Id.*

The case at bar is similar to *Du & Associates*. The solicitation required specific information regarding the experience of Kerr's management team, which perforce would contribute to plaintiff's ability to demonstrate that its team was capable of performing the contract work. AR at 23. In written and verbal communications with Kerr, the Corps requested assurance that Kerr understood the complexity of the contract work. When, after discussions and clarifications had occurred and Kerr still failed to assure the Corps that its management team understood the complexities of the project, the Corps rated Kerr's management plan as unacceptable, even though Kerr's lack of jetty bullnose construction experience was not specifically mentioned during discussions. The Corps, through discussions, led Kerr into the area of the "qualifications, experience and accomplishments . . . of [Kerr's] project team." *Id.* Kerr had notice of this deficiency in its proposal, and discussions regarding this deficiency were meaningful.

## V.   Supplementation of the Administrative Record

The court now turns its attention to plaintiff's motion to supplement the administrative record with the Declaration of Brent Kerr (Kerr Decl.). The declaration consists of three pages of statements in which Mr. Kerr describes the content of communications between Kerr and the Corps, as well as two attached exhibits. Exhibit One is a one-page written inquiry form, dated June 9, 2009, giving the Corps' answer to Kerr's question regarding the timing of the opening of price proposals. Exhibit Two is seven pages of photographs depicting an excavator fitted with a claw attachment. Kerr Decl. ¶ 6, Ex. 2. Neither defendant nor intervenor-defendant responded to plaintiff's motion to supplement the administrative record, although defendant's position appears to be that the statements contained in Mr. Kerr's declaration are irrelevant to the court's review of this procurement. *See* Def.'s Mot. at 17 (referencing Mr. Kerr's declaration and concluding that "[i]rrespective of what may or may not have been stated by Brent Kerr on July 9, 2009," the unacceptable rating of Kerr's jetty stone placement plan was rational); Def.'s Reply at 3 (stating that "Mr. Kerr's post-litigation affidavit . . . is irrelevant and not needed for an effective review" of this procurement).

Although defendant cursorily dismisses Mr. Kerr's declaration as irrelevant and unnecessary to this court's review, the court believes that the question of supplementing the administrative record in this protest deserves a closer look. As plaintiff notes, defendant neither opposed plaintiff's motion to supplement the administrative record, nor contested the accuracy of Mr. Kerr's version of communications between Kerr and the Corps. Pl.'s Reply at 3, 6-7. Plaintiff asserts that "Kerr is supplying this Court with information that was before the agency that they failed to put in the record, statements made by the agency during the procurement process that the agency failed to put in the record, and statements made by the agency during the debriefing process that they failed to put in the record." *Id.* at 7.

The court is mindful of a recent precedential decision of the Federal Circuit, *Axiom Resource Management, Inc. v. United States*, 564 F.3d 1374 (Fed. Cir. 2009), which identifies the acceptable circumstances under which the administrative record may be supplemented in a bid protest. The *Axiom* panel criticized a recent decision of this court which permitted supplementation of the administrative record in a bid protest, and criticized the trial court's over-broad reliance on *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989), a case which provides a list of justifications for the supplementation of the administrative record of an agency action. *Axiom*, 564 F.3d at 1379-81.

The court notes that the *Axiom* panel adopted a restrictive standard for the supplementation of the administrative record in a bid protest, and favorably cited *Murakami v. United States*, 46 Fed. Cl. 731 (2000), *aff'd*, 398 F.3d 1342 (Fed. Cir. 2005). *Axiom*, 564 F.3d at 1380. The *Axiom* standard for supplementation of the administrative record in a bid protest is a direct quotation from *Murakami*, stating that "supplementation of the record should be limited to cases in which 'the omission of extra-record evidence precludes effective judicial review.'" *Id.* (quoting *Murakami*, 46 Fed. Cl. at 735). The Federal Circuit relied on the cases cited by this court in *Murakami* to conclude that "[t]he purpose of limiting review to the record actually before the agency is to guard against courts using new evidence to 'convert the "arbitrary and capricious" standard into effectively de novo review.'" *Id.* (quoting *Murakami*, 46 Fed. Cl. at 735 and citing *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *Camp v. Pitts*, 411 U.S. 138, 142 (1973)). The thrust of the *Axiom* decision, and *Murakami*, is that this court must exercise restraint when considering whether or not to supplement the administrative record in a bid protest. *See id.* (favoring a "more restrictive

approach" and questioning the vitality of *Esch*) (citations omitted); *Murakami*, 46 Fed. Cl. at 735 (stating that the construction of the *Esch* justifications for allowing the supplementation of an administrative record should be "extremely limited") (citations omitted).  For these reasons, the court has carefully scrutinized Mr. Kerr's declaration to determine whether this declaration, fully or in part, is a proper supplement to the administrative record in this case.

As the court understands *Axiom*, there is no reason to supplement the record in a bid protest if the documents proffered are not needed for an effective APA review of the government's procurement decision.  An effective APA review, however, requires a record which contains the information relied upon by the agency as it made its decision, as well as documentation of the agency's decision-making process.  This court's rules specify that the record of a procurement includes "the agency's responses to any questions about or requests for clarification of the solicitation."  RCFC App. C ¶ 22(g).  Exhibit One to Mr. Kerr's declaration is a clear example of a record of this procurement, which should have been included in the administrative record in this case.  As such, Exhibit One to the Declaration of Brent Kerr is a proper supplement to the administrative record.

Exhibit Two to Mr. Kerr's declaration is not alleged to have been before the Corps during the evaluation of Kerr's jetty stone placement plan.  These photographs of a claw-equipped excavator are not alleged to have been attached to any written proposals or clarifications considered by the Corps, or to have been relied upon by the Corps in any fashion.  Because these photographs were not considered by the Corps, and are not evidence of the Corps' decision-making process, Exhibit Two is not a proper supplement to the administrative record in this bid protest.

Finally, Mr. Kerr's statements in his declaration which offer his version of communications between Kerr and the Corps are either duplicative of information presented in the administrative record, or concern an alleged oral representation that was not presented in writing in Kerr's revised proposal.  Neither of these types of statements is necessary for an effective APA review of the Corps' award to Kiewit.  When Mr. Kerr asserts that he was not informed that +22 feet MLLW was a safe working elevation, or that he was not informed that lack of jetty bullnose construction experience was a weakness in Kerr's initial proposal, these statements add nothing to a record which already presents such information.  *Compare* Kerr

Decl. ¶¶ 5, 11 *with* AR at 287, 334-35. As to Mr. Kerr's statement that a custom claw attachment for its excavator was discussed with the Corps on July 9, 2009, such an assertion, if true, has no impact on the rationality of the Corps' evaluation of Kerr's revised technical proposal, which was required to be in writing. *See* AR at 286, 331. For these reasons, none of the statements in Mr. Kerr's declaration are proper supplements to the administrative record, because these statements are not necessary to an effective review of this procurement.

## CONCLUSION

Kerr has not shown that the decision to award the contract to Kiewit was arbitrary or capricious, an abuse of discretion or otherwise contrary to law. Although *de minimis* errors may have occurred in this procurement, none rose to a level justifying judicial intervention, and Kerr was not prejudiced by any Corps missteps. Because Kerr's protest has not succeeded on the merits, the court need not proceed to the question of whether Kerr has shown that it is entitled to injunctive relief from this court. Plaintiff's motion for judgment upon the administrative record is denied, and defendant's cross motion for judgment on the administrative record is granted.

Accordingly, it is hereby **ORDERED** that

(1)    Plaintiff's Motion for Judgment upon the Administrative Record, filed August 26, 2009, is **DENIED**;

(2)    Plaintiff's Motion to Supplement the Administrative Record, filed August 26, 2009, is **GRANTED** in part, as to Exhibit One of the Declaration of Brent Kerr, which is deemed filed as of this date, and **DENIED** in all other respects;

(3)    Defendant's Cross Motion for Judgment upon the Administrative Record, filed September 2, 2009, is **GRANTED**;

(4)    The Clerk's Office is directed to **ENTER** final judgment in favor of defendant and intervenor-defendant, dismissing the complaint with prejudice;

(5)     On or before **October 15, 2009**, counsel for the parties shall
        **CONFER** and **FILE** with the Clerk's Office a **redacted copy** of this
        opinion, with any material deemed proprietary marked out and
        enclosed in brackets, so that a copy of the opinion can then be
        prepared and made available in the public record of this matter; and

(6)     Each party shall bear its own costs.


                            /s/Lynn J. Bush                    
                            LYNN J. BUSH
                            Judge